No. 35,872

ALBERT JOHNSON and ETHEL JOHNSON, *Appellees,* v. THE UNION PACIFIC RAILROAD COMPANY, *Appellant.*

(143 P. 2d 630)

Opinion filed December 11, 1943.

*O. B. Eidson,* of Topeka, argued the cause, and *Ralph Knittle,* of Salina, *T. M. Lillard, P. H. Lewis* and *James W. Porter,* all of Topeka, were on the briefs for the appellant.

*Alex H. Miller* and *C. L. Clark,* both of Salina, argued the cause for the appellees.

The opinion of the court was delivered by

DAWSON, C. J.: This was an action for damages for the death of plaintiffs' son, Cleo Johnson, and for the damages to their automobile, in a nighttime collision with defendant's fast passenger train at a street crossing in Salina.

Ninth street is a much-traveled street which runs north and south through the city. The Union Pacific railroad crosses that street diagonally from northeast to southwest. Defendant's depot is situated about four blocks west of the crossing. Five parallel tracks on defendant's right of way cross Ninth street. About forty yards east of the crossing is the Robinson flour mill, a seven-story building. The Robinson mill is served by three of defendant's switch tracks. Two of these branch off from the southernmost of the five parallel tracks immediately west of the crossing, one of them serving the north side of the Robinson Mill, and the other its south side. The third switch track does not cross Ninth street; its west end is a short distance east of that street; it also serves the south side of the Robinson mill.

A few feet west of Ninth street and a short distance south of the five parallel tracks is a small shelter cabin for crossing watchmen who are kept on duty by defendant in two shifts, one from 7 o'clock a. m. until 3 o'clock p. m., and the other from 3 o'clock p. m. until 11 o'clock p. m. No watchman is kept on duty in the nighttime from 11 o'clock p. m. until 7 o'clock a. m.

At various distances to the south of defendant's series of main-line and switch tracks just described are several other series of tracks, one of which appears to be Union Pacific property; but it and the other series of tracks which lie further away need no consideration in our present study of the *locus in quo.*

About twenty yards east of Ninth street and about 125 yards south of the crossing is the Weber flour mill, a six-story structure. South of the Weber mill and close to the east side of Ninth street was a series of tall elevators. There may have been other business structures thereabout, but those mentioned will show that the vicinity of the crossing on the east side of Ninth street had the usual characteristics of an industrial district—flour mills and elevators running night and day, and switch engines and freight cars moving on the switch tracks at any time of night. The mills, elevators and the street crossing were so well lit up at night that the

glare of the headlight of an approaching train was largely dissipated thereby. The height of the mills and the noise of their operation tended to deflect or overcome the whistle and sound of a bell from a train approaching from the east.

On the night of the accident, November 28, 1940, a fast passenger train from the east, due to arrive at the Salina depot at 1:10 a. m., and running twenty minutes behind time, crossed Ninth street at a speed of forty to fifty miles per hour.

At that time, plaintiffs' nineteen-year-old son, Cleo Johnson, and two companions in plaintiff's automobile came up Ninth street from the south, headed for their homes north of the city. The result was a collision in which plaintiffs' son who was driving the car and one companion were killed; the third youth was injured, and plaintiffs' automobile was wrecked.

Hence this action by the plaintiffs, for the death of their son, and damages to their automobile.

Plaintiffs' amended petition alleged all the material facts at great length. In it was an allegation that plaintiffs' son who met his death in the collision was familiar with the crossing and had crossed it many times, and that he relied upon a watchman to warn him of any approaching train. The allegations of defendants' negligence were (1) operating its train at the negligent speed of fifty miles per hour over a dangerous street crossing, (2) failing to sound warnings by bell or whistle, (3) permitting freight cars to stand adjacent to the crossing so as to obstruct the view of an approaching autoist, and (4) failure to maintain a flagman at the crossing in the nighttime, without notice to the traveling public who were accustomed to the presence of a watchman to warn of approaching trains during daylight hours and until 11 o'clock at night.

Defendant answered with a general denial, and denied that it had a custom or practice of having a watchman on duty in the nighttime. It alleged that such watchman was only maintained between the hours of 7 o'clock a. m. to 11 o'clock p. m. It also alleged that any freight cars which might have been standing on the east side of Ninth street were so far to the east that as plaintiffs' decedent closely approached the main-line tracks there was an unobstructed view to the east, where an oncoming train could be seen.

Defendant also alleged that the death of plaintiffs' son and the damage to their automobile were caused by the negligence of their son who drove the automobile at a high and dangerous rate of speed

as he closely approached the railway track on which defendant's passenger train was running, and—

"That such . . . death, and damage to property, were proximately caused by the negligence of the said Cleo Johnson in that he failed to keep a proper lookout when closing [closely] approaching said railroad track at a time when by the exercise of ordinary care he could have seen the approaching train and could have stopped the said automobile; that he was negligent also in failing to slow down or stop the said automobile, or to drive it slow enough so that it could be stopped before going up to railroad track upon which the train was being operated, and was further guilty of negligence proximately contributing to the damage and injury complained of, in that he drove the said automobile into and against the side of the train of this defendant, Union Pacific Railroad Company, when the train was occupying and was nearly across said Ninth street; in failing to stop, look and listen, when he saw or by the exercise of ordinary care, could have seen that he was approaching a railroad crossing over which a railroad train was being operated; and in failing to properly operate his automobile in order to avoid injury and damage to himself at said time and place."

In their reply plaintiffs alleged that—

"If said flagman was not maintained at said crossing later than 11:00 o'clock at night that the same was unknown to the said Cleo Johnson and to the general public and that Cleo Johnson thought that the defendant maintained a fulltime flagman at said crossing and relied upon him as such as is set forth in said amended petition."

The cause was tried to a jury. At the conclusion of plaintiffs' evidence, defendant interposed a demurrer which was overruled. Defendant then introduced its evidence; the court instructed the jury; the cause was argued by counsel; the jury retired and deliberated but failed to reach a verdict and were discharged.

The cause is brought to this court to review the trial court's rulings on defendant's demurrer to the evidence on two grounds—first, that the evidence failed to show negligence on the part of the defendant, and second, that the contributory negligence of plaintiffs' son was so clearly established as a matter of law that it was a question for the trial court to decide and not one for submission to the jury.

Counsel for neither side devote much space to the alleged negligence based on the speed of the train, the alleged failure to sound bell or whistle, nor in the matter of permitting freight cars to stand on the switch track near the east side of the crossing. No statute, state or federal, and no city ordinance was cited as governing the speed of passenger trains entering the city of Salina. The depot at which the train was to stop was only four blocks to the west, so

the engineer's testimony that his train crossed the Ninth street intersection at his usual speed of forty miles per hour could not be far from correct. Some of plaintiffs' witnesses estimated the speed of the train as high as fifty miles an hour, but this matter is of no consequence, as the accident was not caused by the speed of the train. (*Morris v. Railway Co.*, 103 Kan. 220, 225, 173 Pac. 346; 52 C. J. 276.)

One argument in support of plaintiffs' theory that the crossing was a highly dangerous one, requiring that it should have been guarded night and day by a watchman or by some other efficient provision to insure public safety, is that owing to the noise of the mills and elevators and the height of the tall buildings thereabout, the sound of a bell or whistle could not be heard.

Touching the alleged negligence in permitting freight cars to be placed on the switch track near the east side of Ninth street, that is what switch tracks are for, and courts and juries cannot dictate to a railway company where its freight cars should be placed. (*Adams v. Missouri-K.-T. Rld. Co.*, 119 Kan. 783, 241 Pac. 1086, and citations.) If it is to be declared unlawful to set freight cars on a switch track near a city street, legislation of some sort will have to say so; the practice cannot be otherwise forbidden or penalized.

So we come to the two outstanding questions in this lawsuit—the negligence of the railway company; and the contributory negligence of plaintiffs' son, the youth who met his death in the collision.

Touching the first of these questions, it cannot be left out of consideration that defendant itself regarded the crossing as dangerous to some extent, since it maintained a watchman for sixteen hours of the day and night. It was not shown that the traffic between 11 o'clock at night and 7 o'clock in the morning was so much less than for the other eight hours of the night and early morn that the keeping of a watchman on duty was needless. The testimony was that the nighttime travel on Ninth street was considerable.

Counsel for defendant argue that since no statutes or city ordinance (or state or interstate safety regulation) required it to keep a watchman at the crossing at any time, it should not be held to a higher degree of diligence for the operation of its railroad at the crossing in the nighttime on the mere ground that it did more than it was required to do for public safety at the crossing in the daytime.

The argument is plausible, but the crux of the question of de-

fendant's negligence is whether the crossing was so dangerous that a duty rested on it to make some reasonably adequate provision for the public safety thereat—by maintaining a flagman, a wig-wag, a flicker, a crossing gate or other efficient device. Reasonable minds might be permitted to reach different conclusions on that question, and if so, could this court dispose of it as a matter of law?

In *Cross v. Chicago, R. I. & P. Rly. Co.*, 120 Kan. 58, 60, 61, 242 Pac. 469, is an excerpt from the often-cited case of *Grand Trunk Railway Co. v. Ives*, 144 U. S. 408, where the late Mr. Justice Lamar referred to many cases analogous to the one at bar, and said:

"As a general rule, it may be said that whether ordinary care or reasonable prudence requires a railroad company to keep a flagman stationed at a crossing that is especially dangerous, is a question of fact for a jury to determine, under all the circumstances of the case, and that the omission to station a flagman at a dangerous crossing may be taken into account as evidence of negligence; although in some cases it has been held that it is a question of law for the court. It seems, however, that before a jury will be warranted in saying, in the absence of any statutory direction to that effect, that a railroad company should keep a flagman or gates at a crossing, it must be first shown that such crossing is more than ordinarily hazardous: as, for instance, that it is in a thickly populated portion of a town or city; or, that the view of the track is obstructed either by the company itself or by other objects proper in themselves; or, that the crossing is a much travelled one and the noise of approaching trains is rendered indistinct and the ordinary signals difficult to be heard by reason of bustle and confusion incident to railway or other business; or, by reason of some such like cause." (p. 421.)

In Rose's Notes to this case, in 36 L. Ed. 485, at pages 1202, 1203, a plethora of federal and state cases are collated which more or less closely follow it.

While recent decisions are not uniform, there is highly respectable authority which holds that a railway company is under a duty to install a signalling device or to take some other adequate measures for the safety of the traveling public at a railway crossing, although no statute or official order of some governmental agency has required it; the theory of these decisions being that statutory or governmental requirements are merely the minimum of the railway company's duty, while the hazards of some particular crossing may require greater precautions for public safety. Such is the tenor of the instructive opinion of the Minnesota supreme court in *Licha v. Northern Pacific Ry. Co.*, 201 Minn. 427, 276 N. W. 813. To like effect are *Sisk v. Chicago, B. & Q. R. Co.*, (Mo. App.) 67 S. W. 2d 830; *Louisiana Ry. & Nav. Co. v. Loudermilk*, (Tex. Civ. App.) 295

S. W. 193; *Constantine v. Pennsylvania R. Co.*, 114 F. 2d 271; and *Duluth, W. & Pac. Ry. Co. v. Zuck*, 119 F. 2d 74. In *Bledsoe v. M.-K.-T. Rld. Co.*, 149 Kan. 741, 746, 747, 90 P. 2d 9, we took cognizance of this doctrine, but held it inapplicable to the facts of that case. See, also, *Smith v. A., T. & S. F. Rly. Co.*, 145 Kan. 615, 66 P. 2d 562, and syl. ¶ 3.

In the present case the trial court gave a fair instruction to the jury touching the pertinent law. It reads:

"The jury is further instructed that if, under the circumstances of this case, the jury finds that the surrounding conditions and circumstances of that crossing where the collision occurred were such as made it unusually dangerous, then the jury may inquire as to whether a reasonably prudent person under such circumstances would have maintained a watchman at such crossing at the time of the collision, and in determining whether or not such crossing was unusually dangerous, you may take into consideration the obstructions, if any, to the view of the decedent when approaching the crossing, such as box cars, if any, or other objects proper in themselves, and you may consider whether or not said crossing was a much traveled one, and the noise, if any, incident to the railway or other businesses, the location of said crossing within the city, and all of the surrounding circumstances of this crossing at the time of the collision, and if you find, after due consideration of such circumstances, that such crossing was an unusually dangerous one, and if you further find that an ordinarily prudent person would have maintained a flagman at said crossing at the time of the collision then you are instructed that such failure to maintain a flagman at said crossing at the time of the collision was negligence on the part of the defendant, but such negligence, if any, would not excuse the deceased from exercising ordinary care on his part, as defined in these instructions."

A majority of this court are inclined to hold that the heavy traffic over the Ninth street crossing, the tall buildings and the noise of industry thereabout which deflected or muffled the sound of railway engine bell or whistle, the shortened range of vision for motorists approaching the crossing from the south, the many railway tracks thereabout, and the moving of switch engines and freight cars thereon—that these circumstances created a situation where it could not be dogmatically stated as a matter of law that the crossing was not dangerous. It was, this court holds, a fair jury question, which if thus established, would render the defendant guilty of negligence in not maintaining a flagman at the crossing at the time of the collision.

A more critical question is raised in defendant's contention that plaintiffs' son was guilty of contributory negligence in driving the automobile onto the railway track without taking any precautions

for his own safety. Plaintiffs' evidence showed that their son was familiar with the crossing, having driven over it many times by day and by night, and that he was accustomed to see a flagman signalling traffic of an approaching train. There was no evidence on the point whether he knew that the defendant did not keep a flagman on duty at the crossing after 11 o'clock at night. Alfred Priddy, who rode in the car and who survived the collision, testified that he and his two companions had been to a dance that night; that following the dance they had taken two young ladies to their homes in town, and then started north on Ninth street towards their homes. His testimony continued thus:

"Cleo Johnson was driving the car. I am familiar with the intersection of Ninth and the Union Pacific tracks, and had frequently crossed that crossing as an operator of an automobile. . . . At the time we approached the crossing on November 28, 1940, I would say the Johnson car was maintaining a speed of about fifteen miles an hour during the last fifty feet before you entered the tracks and up to the time of the collision. I was in the back part of the automobile. Johnson and Charles Lammon were in the front seat. From the time the Johnson car turned north on Ninth street that night until the time it got to the intersection, we never went over fifteen miles an hour, I don't believe. The automobile was being operated on the east part of Ninth street. It was right in the center of the east path. The headlights were burning on the car. They were good headlights. The brakes on the car were in good shape. I have been over that crossing after eleven p. m. with Cleo Johnson. I never did notice a crossing watchman, a colored man or anyone else, flagging after eleven p. m. I have been with Cleo Johnson in an automobile going across that crossing at night when the crossing watchman wasn't there after eleven p. m. The automobile was going at a speed of fifteen miles an hour as we approached the point where the accident occurred, and it continued at that speed clear up to the time of the accident without stopping at any time before the collision occurred or without slowing down. . . . It was a cool evening. Moisture from our breath condensed on the inside of the glass of the car. That was not the condition of the car when we started to go across the crossing. The boys kept wiping the windshield off. I wouldn't say whether the side windows were frosted over or not. . . . They were when we started from the dance. The car had been parked in front of the dance hall all the time we were there with nobody in it. The windshield and the side windows were free of steam or anything that would obstruct the vision as we started over the crossing. I wouldn't say that they were perfectly clear, but they were kept wiped off so you could see. You could not see out the side windows in the rear as we came across the crossing that night. I was looking straight ahead. I guess I could have looked in a northeasterly direction as we were going north and look out the front window of 'that car if I had wanted to look that way. As we came across there that night, I could see through it, but I didn't really look at it. The rear window where I was sitting on the east side was obstructed. It was fogged over. I was not paying

much attention to where we were going. I was just riding. I saw the Lammon boy and the Johnson boy keep wiping the windows and windshield off while they were in the front seat. At the .times the Johnson boy and I crossed the Union Pacific tracks prior to November 28th, I don't believe there were any trains crossing the intersection at those times and I did not see a flagman."

Such was the testimony of plaintiffs' witness who knew most about the accident, and there was none to the contrary. It will thus be seen that decedent did not slacken his speed as he approached the tracks; he did not keep his car under control nor use his brakes so he could stop if necessary; he did nothing whatever to insure his own safety. If he had looked to the east, as he approached within twenty-two feet of the crossing he would have had a clear view of an approaching train, for "1000 feet" according to the testimony of the street commissioner who was plaintiffs' witness.

It is argued that the decedent relied on the assumption that a flagman would be at the crossing to warn him if a train were approaching. But if it was negligence for defendant not to have a flagman on duty at that time of night, such negligence of the railroad company did not excuse Cleo Johnson of the duty to exercise due care for his own safety. This is settled law in this jurisdiction in cases where it is sought to charge a railway with negligence and to subject it to damages to life or property in crossing-accident cases. This court has declared and applied this rule of law many times. In our recent case of *Dickerson v. M.-K.-T. Rld. Co.*, 149 Kan. 314, 317, 87 P. 2d 585, where an adverse ruling on a railway company's demurrer to plaintiff's evidence in a crossing-accident case was in question we said:

"That demurrer was predicated on our oft-repeated rule of law that a man about to cross a railway track on a public road must assure himself that it is safe to do so, and if his own evidence shows that he did not take those precautions, which common prudence and the law require, he has himself to blame if he or his property is injured or damaged by a railway train, and his contributory negligence thus so clearly established will bar his recovery of damages as a matter of law. And this rule applies although the railway company and its train crew may have been negligent also."

In the case just cited and in *McCune v. Thompson*, 147 Kan. 57, 75 P. 2d 294, most of the later decisions of this court are cited and referred to. Our leading earlier crossing-accident cases were collected and cited by the late Mr. Justice Marshall in *Jacobs v. Railway Co.*, 97 Kan. 247, 154 Pac. 1023; and *Wehe v. Railway Co.*, 97 Kan. 794, 156 Pac. 742; so that this state has a consistent body of

law relating to the duty of one about to cross a railway track to assure himself that he may safely do so; his diligence must be commensurate with the hazard; and if he fails in that duty the negligence of the railway company, whatever it may have been, will not exempt him from being guilty of contributory negligence as a matter of law. It may be superfluous to quote excerpts from our own cases in support of this long-established rule. Our early case of *U. P. Rly. Co. v. Adams*, 33 Kan. 427, 6 Pac. 529, states the Kansas rule as well as any. In that case the alleged negligence of the railway company was in failing to set up a railway crossing sign and the failure of its approaching train to sound the whistle. This court, speaking by Mr. Justice Johnston, later Chief Justice, said:

"The negligence of the defendant, then, must be regarded as proved. The contention of the defendant, however, is that the plaintiff's testimony discloses that her own want of ordinary caution and care directly contributed to the injury. The negligence of the defendant in such a case is not always sufficient to warrant a recovery, and while contributory negligence on the part of the plaintiff is a matter of defense, still if the plaintiff's evidence shows that her injury was the proximate result of her own negligence, she has failed to make out a *prima facie* case, and notwithstanding the negligence of the defendant, the demurrer to the evidence should be sustained. (*Gibson v. City of Wyandotte*, 20 Kan. 158.)

"It is now well settled in this state and elsewhere, in cases where the plaintiff seeks to recover for injuries on the ground of defendant's negligence, that if the ordinary negligence of the plaintiff directly or proximately contributed to his injury, he cannot recover unless the injury was intentionally and wantonly caused by the defendant. (Citations.)

"It is equally well settled that it is the duty of a traveler upon a highway about to cross a railroad track, to make a vigilant use of his senses in order to ascertain whether there is a present danger in crossing. This is required not alone for his own safety, but also for the protection of the lives of the passengers upon the railway trains. The traveler who fails to take this precaution is not using ordinary care." (p. 429.)

In the body of the same opinion, page 432, is an excerpt from *Railroad v. Houston*, 95 U. S. 697, worth quoting, but here we prefer to make our own selection from that opinion:

"The failure of the engineer to sound the whistle or ring the bell, if such were the fact, did not relieve the deceased from the necessity of taking ordinary precautions for her safety. Negligence of the company's employees in these particulars was no excuse for negligence on her part. . . . If one chooses, in such a position, to take risks, he must bear the possible consequences of failure. Upon the facts disclosed by the undisputed evidence in the case we cannot see any ground for a recovery by the plaintiff. Not even a plausible pretext for the verdict can be suggested, unless we wander from the

evidence into the region of conjecture and speculation. Under these circumstances, the court would not have erred had it instructed the jury, as requested, to render a verdict for the defendant." (p. 702.)

The syllabus in the Adams case, *supra*, in part reads:

"It is the duty of a person about to cross a railroad track to make a vigilant use of his senses as far as there is an opportunity, in order to ascertain whether there is a present danger in crossing. A failure to listen, or look, when by taking this precaution the injury might have been avoided, is negligence that will bar a recovery, notwithstanding the negligence of the railroad company in failing to give signals contributed to the injury. (Citations.)"

In *Jacobs v. Railway Co.*, supra, where the failure of an electric signal bell at a railway crossing was the basis of the negligence charged against the railway company, and because of that negligence plaintiff claimed exemption from his own amenability to the rule of contributory negligence barring recovery. But this court said:

". . . the failure of an electric bell to ring does not relieve one about to cross a railroad track of the imperative duty to look and listen before crossing. If he fails to do so, he is guilty of such contributory negligence as will prevent his recovery for any injuries sustained, and there is nothing to submit to the jury. . . .

,"This court has often said that whether negligence in a particular case is shown is ordinarily a question for the jury, *but when the facts are undisputed* . . . only one conclusion can be drawn therefrom, it becomes a question of law for the court." (Our italics.) (pp. 251, 253.)

The same rule has been consistently applied in a multitude of our decisions for the last sixty years and no sound reason has been suggested for departing from it in the instant case.

If it be argued that it must be assumed that Johnson (and his companion) on the front seat did look to see if a train was approaching, the complete answer is that if he looked where he could not see, such looking would not discharge his duty to exercise reasonable vigilance for his own safety; and when he approached sufficiently near to the crossing so he could see the approaching train, if he had kept his car under control so he could have stopped it he would have been alive today. This rule of law and its application are trite and commonplace in our reports. Thus in *Ek v. Chicago, R. I. & P. Rly. Co.*, 132 Kan. 177, 179, 294 Pac. 663, where a fourteen-year-old boy was killed at a railway crossing when he drove his automobile onto a railway track without looking for the possible approach of a train, Mr. Justice Smith said:

"The rule is so well settled as not to require the citation of authorities that 'ordinary care requires that a traveler approaching a railroad crossing shall take such precaution for his safety as would be used by persons of ordinary prudence under like circumstances and conditions.' (*Clark v. Atchison, T. & S. F. Rly. Co.*, 127 Kan. 1, 172 Pac. 128, and cases cited therein.) According to the evidence, when he was fifteen feet from this track had he looked he could have seen an approaching train for a considerable distance. Evidently he did not do so. The evidence is, further, that had he looked when the front of his car was just a foot or two from the track he could have seen the train several miles away. Had he looked he would be alive today. This court is not prepared to say that ordinary care and precaution did not demand of Chester that he proceed to this track slowly enough to stop just before his car got into a position where it could be hit by a train, and look down the track to see if a train was approaching. We must conclude that his failure to do so was negligence that cost him his life."

In *Clark v. Atchison, T. & S. F. Rly. Co.*, cited in the opinion of Mr. Justice Smith, *supra*, Mr. Chief Justice Johnston said:

"It was not due diligence for plaintiff to look and listen where he could not see or hear the train. He failed to stop, but drove on the track without taking other precautions than to slow down and look and listen, and knowing of the obstructions and that the ordinary means for ascertaining the perils of the crossing were not available, he should have stopped his team and vehicle and gone forward to a point where he could have had a view of the track and of the coming train. If he had done so he would have had a view of the track for a mile east of the crossing and could thus have avoided the collision and the injury suffered." (p. 5.)

In *Brim v. Atchison, T. & S. F. Rly. Co.*, 136 Kan. 159, 163, 12 P. 2d 715, where a verdict and judgment against a railway company in a crossing case were set aside on the ground of contributory negligence of the deceased, this court said:

"Counsel for appellee direct our attention to finding No. 10, which declares that Brim looked and listened just before he did attempt to drive across the track. To that there are two effective answers: first, there was no evidence to support that finding; and second, if he looked at any point where it would have done any good to look, he must have seen the approaching train (*Young v. Railway Co.*, 57 Kan. 144, 45 Pac. 583; *Pritchard v. Railway Co.*, 99 Kan. 600, 162 Pac. 315; *Crane v. Railway Co.*, 89 Kan. 472, 131 Pac. 1188; *Gaffney v. Railway Co.*, 107 Kan. 486, 192 Pac. 736); and if he looked at a point where he could not see, such a futile act would not discharge his duty to himself as a man of ordinary prudence (*C. K. & W. Rld. Co. v. Fisher*, 49 Kan. 460, 482, 483, 30 Pac. 462) to ascertain whether a train was approaching ere he ventured to cross that place of danger. In *Railway Co. v. Wheeler*, 80 Kan. 187, 191, 101 Pac. 1001, it was said:

" 'It is not enough for a traveler to look where an approaching train cannot be seen or to listen when it cannot be heard. Nor will it suffice that one has looked some distance away from the crossing when a view on a closer approach

would have revealed the danger. (*Railroad Co. v. Holland,* 60 Kan. 209; *Railroad Co. v. Entsminger,* 76 Kan. 746.) Where by reason of obstructions or noises an approaching traveler cannot see or hear a coming train, it may be necessary for him to stop or take some other suitable precaution to ascertain whether there is a train in dangerous proximity. (*A., T. & S. F. Rld. Co. v. Hague,* 54· Kan. 284.) In short, he must exercise care proportionate to the perils of the place.' [Opinion by Johnston, C. J.]" (p. 163.)

See, also, *Pagan v. Lowden,* 145 Kan. 513, 519, 66 P. 2d 567.

In the case at bar the question of decedent's contributory negligence must be faced and decided as a matter of law; it did not present a question for a jury on matters of disputed fact; and defendant's demurrer to plaintiffs' evidence should have been sustained.

The judgment of the district court is reversed with instructions to render judgment for defendant.

HARVEY, J. (dissenting in part): I dissent from that portion of the opinion which holds that Cleo Johnson, for whose death this action was brought, was guilty of such contributory negligence as a matter of law that plaintiffs cannot recover. I think the question of his contributory negligence was for the jury.

I think it is well settled in this state that when a traveler upon a street or highway approaches a railroad crossing at which he has reason to believe a flagman will be stationed to give warning of an approaching train, he is entitled to rely upon that fact to some extent; that while the absence of the flagman under such circumstances will not excuse him for a failure to exercise due care for his own safety, yet in determining what constitutes due care under such circumstances consideration must be given to the absence of the flagman. In this state the leading case on that question is *McClain v. Railway Co.,* 89 Kan. 24, 130 Pac. 646, the pertinent paragraphs of the syllabus of which read:

"Where gates have been erected and maintained by a railroad company where its road crosses a public street in a city, and which are to be lowered by a gateman when trains are passing over the street, the fact that such gates are up when a person approaches the crossing is some assurance to him that he can safely proceed to cross, and while it will not excuse him for a failure to exercise reasonable care for his safety, he is not required to exercise the same vigilance as he would be at a crossing where gates had not been erected and maintained.

"A traveler approached a railway crossing over a much traveled street in a populous city where gates had been built and maintained, and finding them open proceeded to cross the street without looking up the track, where a passenger train was approaching from the north at an excessive and unlawful

rate of speed, and which he could have seen if he had looked. After starting across the tracks a freight train came over the crossing from the other direction and caused him to stop between the two tracks in a space eight and one-half feet wide. After standing there about fifteen seconds he was struck by the engine of the passenger train and killed. Whether he exercised due care for his own safety, in view of the conditions existing at the crossing and under the circumstances of the case, or was guilty of contributory negligence, is held to be a question of fact for the determination of a jury." (Syl. ¶¶ 3, 4.)

In the opinion it was said:

"Ordinarily if a traveler proceeds across a railroad track without taking the precaution to ascertain if there is a train in dangerous proximity he does so at his peril. The application of this rule is modified to some extent by the circumstance that gates have been erected and watchmen employed at crossings. In such case a traveler is not required to exercise the same viligence [vigilance] when he approaches a track as he would at crossings not so guarded. The railroad track itself is a warning of danger which a traveler cannot safely ignore, but when it is the custom of a railroad company to provide gates or flagmen and thus give warnings of danger that a train is about to pass, the absence of such warnings may lead a traveler to believe that he can safely proceed or that there will be time to cross before a train will pass. The fact that gates have been erected and are open when a traveler approaches a crossing will not justify him, of course, in closing his eyes and ears when passing over railroad tracks, but it is a circumstance to be weighed by the jury in determining whether at the time he was using the care that a reasonable and prudent man would and should exercise." (p. 30.)

Decisions from other states and federal courts were cited. Note was taken of some state decisions to the contrary, and it was said (p. 32): ·

"The authorities, however, are generally in accord with the decisions from which quotations have been made, and among them may be cited *Williams v. Railroad Co.*, post, p. 35, 53 Pac. 834," (and a long list of cases from other states).

In *Williams v. Railroad Co.*, (59 Kan. 777, memorandum opinion only, 53 Pac. 834) 89 Kan. 35, where an order sustaining a demurrer to a petition was reversed, it was said (p. 36):

"While Williams was bound to use care and caution to avoid injury at the crossing, and while he might easily have taken a position between the two tracks where there would have been no danger of collision, there are some circumstances which cannot be overlooked in determining whether he exercised a degree of care such as a man of ordinary prudence would have exercised under similar circumstances. . . .

"The fact, if it be a fact, that no signals were given, that the gates were open, and no flagman or other employee on or about the train on the passing track, might tend to lull him into a feeling of security and cause him to assume that there was no purpose of moving the cars on that track."

In *Jacobs v. Railway Co.*, 97 Kan. 247, 154 Pac. 1023, where an electric bell maintained at the crossing was not working when the driver of an automobile drove upon the track, the McClain case was cited with approval, but distinguished. The court said:

"Human intelligence guarded the crossing and operated the gate in that case. . . . An electric bell, . . . cannot be classed with a gate thrown across a street to prevent passing over railroad tracks; neither can it be classed with a flagman who stands in the street and stops those who desire to cross when there is danger." (p. 250.)

(Compare *Peterson v. Railway Co.*, 115 Kan. 751, 225 Pac. 116, where a different result was reached, one justice dissenting, being "unable to distinguish this case from *Williams v. Electric Railroad Co.*, 102 Kan. 268, 170 Pac. 397," a case which did not involve a wigwag, which was not working.)

In *Weston v. Hines*, 107 Kan. 625, 193 Pac. 340, although it was not cited, the principle involved in the McClain case was applied, where plaintiff understood the flagman to signal her to go ahead across the track. An instruction on that question, criticized by defendant, was quoted and the court said:

"Under this instruction the fact that the flagman signaled the plaintiff to go ahead did not relieve her wholly from the duty of looking out for herself, but did prevent her omission to take any specific precaution from constituting contributory negligence as a matter of law, the jury being left to determine whether in view of all the circumstances, including the giving of the signal by the flagman, she had exercised reasonable care. This view is in accordance with the weight of authority.

" 'It cannot be said as a matter of law that the plaintiff in such a case may rely solely upon the flagman; neither can it be said, as a question of law, that his failure to look or listen is not contributory negligence. It is a question of fact, to be determined by the jury.' (22 R. C. L. 1045.)" (p. 627.)

In *Holland v. Railroad Co.*, 112 Kan. 609, 212 Pac. 90, the McClain case was cited with approval and the principle therein followed, although the facts were quite different.

In *Bollinger v. Railway Co.*, 113 Kan. 124, 213 Pac. 644, plaintiff was injured in a collision of the car which she was driving and a train at a crossing in a city street where plaintiff had reason to believe there would be a flagman if a train were approaching. She did not see the train until she was within eight feet of the track, but when twenty-eight feet from the track, had she looked, she could have seen the train approaching. Defendant contended plaintiff's contributory negligence barred her recovery. In the opinion the court said:

"The courts have in quite a few cases passed on the question of what effect, if any, the absence of a flagman at a crossing where he was known by plaintiff to be required to be would have upon the contributory negligence of the plaintiff. Some cases hold that a traveler who is familiar with the practice of a railroad company of having a flagman at a crossing when the trains are approaching is entitled to regard the absence of the flagman as an indication that it is safe for him to cross the track. (*Dolph v. New York, N. H. & H. R. Co.*, 74 Conn. 538; *Chicago & A. R. R. Co. v. Wright*, 120 Ill. App. 218.) Other cases hold that while the traveler is not entitled to rely solely upon the absence of the customary flagman as an indication of safety such absence will have some effect in relieving him from contributory negligence. (*Railway Company v. Amos*, 54 Ark. 159; *Roberts v. Railroad*, 69 N. H. 354; *Berry v. Pennsylvania Railroad Co.*, 48 N. J. L. 141; *Southern R. Co. v. Aldridge*, 101 Va. 142.) In *Montgomery v. Railroad*, 181 Mo. 477, the absence of a flagman customarily at a crossing is spoken of as a potent factor in considering the conduct of a traveler in proceeding over the crossing. In *Edwards v. Chicago & Alton Ry. Co.*, 94 Mo. App. 36, the court said the rule requiring a person about to cross a railroad to look and listen is modified when the crossing is one usually guarded by a flagman so as to allow a passenger to rely to some extent upon being warned if there is danger. Quite a few cases hold that whether a traveler is justified in relying upon the absence of a flagman as an indication of safety, and the extent to which he is so entitled to rely, is a question of fact for the jury. (*P., C., C. & St. L. R. R. Co. v. Smith*, 110 Ill. App. 154; *Richmond v. Railway Co.*, 87 Mich. 374; *Woehrie v. Minnesota Transfer Ry. Co.*, 82 Minn. 165; *C., St. L. & P. R. R. Co. v. Hutchinson*, 120 Ill. 587.)

"Taking all the circumstances of the case into consideration, including the fact that plaintiff had some reason to think a train was not coming when she did not see the flagman there, and her duties in relation to the situation, we cannot say as a matter of law that the plaintiff was guilty of contributory negligence which precludes her recovery. The question was properly left to the jury. (*McClain v. Railway Co.*, 89 Kan. 24, 130 Pac. 646; *Williams, v. Railroad Co.*, 89 Kan. 35, 53 Pac. 834; *Weston v. Hines*, 107 Kan. 625, 193 Pac. 340.)" (p. 127.)

The case of *Bollinger v. Railway Co.*, 114 Kan. 669, 220 Pac. 274, grew out of the same accident and the court again reviewed defendant's contention that plaintiff was barred by contributory negligence as the driver of the car. Judgment for plaintiff was affirmed on authority of the earlier case.

Without quoting from them, we note the fact that the principle involved in the McClain case was approved and applied in *Polfer v. Chicago, G. W. Rld. Co.*, 130 Kan. 314, 286 Pac. 240; *Kindig v. Atchison, T. & S. F. Rly. Co.*, 133 Kan. 459, 1 P. 2d 751; and *Lane v. Atchison, T. & S. F. Rly. Co.*, 151 Kan. 113, 122 *et seq.*, 98 P. 2d 403.

Each of the cases above cited was decided by a unanimous court.

In each case it was held that the contributory negligence of the driver of the automobile which collided with the train was a question of fact for the jury and not one of law for the court.

. Our McClain case is cited, with many others, as being in harmony with the text in 52 C. J. 502, in 22 R. C. L. 1042, and in 44 Am. Jur. 818.

*Blackwell v. Railroad Co.*, 331 Mo. 34, 52 S. W. 2d 814, was an action for damages growing out of a collision at defendant's crossing at Lawrence, Kan., where ordinarily a flagman was stationed and plaintiff's evidence disclosed there was none and that there was no other warning of the approach of the train by a bell or whistle. Upon defendant's appeal from a judgment for plaintiff it was argued plaintiff was guilty of contributory negligence as a matter of law. After stating the facts the court said: ´

"We do not agree with this contention. . . . While the absence of warning signals by bell or whistle or by a watchman at the crossing would not justify plaintiff in closing her eyes and ears, and giving no heed for her own safety, it is a circumstance to be considered by the jury along with other facts and circumstances in the case in determining whether or not plaintiff acted as an ordinarily prudent person would have acted under like circumstances. Numerous Kansas decisions so hold." (p. 40.)

Citing and quoting from *McClain v. Railway Co.*, supra; *Bollinger v. Railway Co.*, supra, and citing *Weston v. Hines*, supra; *Polfer v. Chicago, G. W. Rld. Co.*, supra; *Torgeson v. Missouri-K.-T. Rld. Co.*, 124 Kan. 798, 262 Pac. 564; *Peterson v. Railway Co.*, 115 Kan. 751, 225 Pac. 116, and their own case of *Sing v. St. Louis-San Francisco Ry. Co.* (Mo.), 30 S. W. 2d 37. See, also, *Scott v. Mo. Pac. Railroad Co.*, 333 Mo. 374, 62 S. W. 2d 834.

The question discussed in the above cases was presented by the evidence in this case and argued in the briefs of counsel. There is no reason to ignore it. I think the question should be discussed in our opinion and that our own cases should be followed.

I find no mention of a bell in the testimony. A question propounded to one of the witnesses suggested that the train was being pulled by a Diesel engine equipped with a horn and a whistle, and I find no testimony on the question whether or not the horn was being blown as the train approached this crossing. All of the witnesses—perhaps half a dozen—who were in position to hear the train's whistle, if one had sounded for this crossing, testified they did not hear it, or that they did not remember hearing it. There is testimony that as the train was coming into town it whistled for the

crossing on Santa Fe street, but that crossing is about a quarter of a mile northeast of the Ninth street crossing where the collision occurred. The whistle for that crossing was half a mile or more from the Ninth street crossing. No witness testified that the train whistled, or that the bell was rung, or the horn blown, for the Ninth street crossing.

I think it inaccurate to say that Cleo Johnson, driving the automobile, as he approached the intersection did nothing for his own safety. There is testimony quoted in the opinion to the effect that he was driving at a reasonable speed, fifteen miles per hour; that he had stopped at the stop sign on entering Ninth street—the only stop sign on his way—and that as he drove north on Ninth street he and the young man in the front seat with him were using a rag to wipe off the moisture which had condensed on the inside of the glass of the windshield and the front side windows so they could see. I think it reasonable to infer that, having done so, they looked to see if there was a flagman at the crossing and for anything else necessary for their safety. In fact, the driver is presumed to have done everything necessary for his own safety except as to such acts as that presumption may have been overcome by evidence. (*Fike v. Railway Co.*, 90 Kan. 409, 133 Pac. 871; *Jones v. Railway Co.*, 91 Kan. 382, 137 Pac. 796; and see *Scott v. Railway Co.*, 113 Kan. 477, 215 Pac. 280.) If it was his duty to look for a train when he was unable to see a flagman at the crossing it was as much his duty to look to the southwest as it was to look to the northeast. To the northeast there were many lights about the buildings and near the crossing, which the evidence tended to show would diffuse the headlight of the train, and there were noises from the three mills, which were being operated at full capacity, and from switch engines in the yards, that would tend to drown the sound of the approaching train. Also there is evidence tending to show that the train, scheduled at an average speed of sixty miles per hour, and forty miles per hour in the yard limits, was slowing down to stop at the station, 1,420 feet southwest of the Ninth street crossing, and was not making much noise.

The sole ground on which the opinion finds contributory negligence of Cleo Johnson which defeats recovery in this case is the fact that it was possible, when he was twenty-two feet south of the main line, to see the approaching train if he had looked in that direction at that time. At his speed of fifteen miles per hour it took but one

second for his car to travel that distance. Standing alone, that is insufficient under the authorities above cited upon which this court should reach the conclusion that he was guilty of negligence as a matter of law. The triers of fact were not only authorized but were bound to consider all the facts bearing upon the contributory negligence of Cleo Johnson. This was an action for a money judgment. Plaintiffs were entitled to a trial by jury and should not be limited to a trial to this court on the facts. The question of his contributory negligence was a question of fact to be determined by the jury and the trial court.

SMITH and PARKER, JJ., join in the foregoing dissenting opinion.